638 So.2d 257 (1994)
MONSANTO COMPANY
v.
ST. CHARLES PARISH SCHOOL BOARD, et al.
No. 93-CA-847.
Court of Appeal of Louisiana, Fifth Circuit.
May 11, 1994.
Rehearing Denied July 18, 1994.
*258 Gary A. Bezet, Linda S. Akchin, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., Baton Rouge, for plaintiff-appellant.
Roy M. Lilly, Jr., Sanford & Lilly, a Law Corp., Gibsland, for defendants-appellees.
Before BOWES, WICKER and CANNELLA, JJ.
WICKER, Judge.
This matter comes before us on appeal by Monsanto Company, which owns a chemical plant in St. Charles Parish. Monsanto sued the St. Charles Parish School Board and the board's Director of Tax Collections (who are responsible for the collection of all parish sales and use taxes) for refund of sales taxes paid under protest by Monsanto. Monsanto also sought recovery of the penalties and interest it paid on those taxes. The trial court found the taxes were properly assessed and dismissed Monsanto's suit. We affirm, for the reasons that follow.
Monsanto contends the Director erred in assessing sales taxes on payments Monsanto received from Texaco, Inc. pursuant to a contract between the companies. At issue is whether Monsanto was selling "wet CO2" (a carbon dioxide waste byproduct of ammonia production) or "dry CO2" (purified carbon dioxide that has been compressed and had the moisture removed), and whether the services provided by Monsanto in processing the wet CO2 into dry CO2 were part of the sale.
Texaco needed large quantities of dry CO2 for use in recovery of crude oil. Under the contract Texaco built a gathering/compression/dehydration facility within Monsanto's St. Charles chemical plant, at which Monsanto processed wet CO2 into dry CO2 for sale to Texaco. Monsanto's monthly invoices to Texaco listed separately the amounts for administrative services (termed by Monsanto a "commodity charge"), operating expense, electricity expense, and volume of CO2 sold at a fixed price per thousand-cubic-foot unit (kcf). Monsanto charged Texaco sales tax on the charges for CO2 sold, but not on the amounts for commodity charges, operating expenses, or electricity.[1]
Following an audit the Director notified Monsanto that additional taxes, plus penalties and interest, had been assessed. The amounts in question were assessed for periods from June 1983 through May 1986 and totalled $329,304, comprising $211,658 in taxes, $52,915 in penalties, and $64,731 in interest. The Director's position is that the raw material and the manufacturing costs incurred in producing the finished product should be part of the tax base. Monsanto contends the Director erroneously included those amounts in the taxable base for sales made by Monsanto during the tax period.
The trial judge reached the following conclusions in her written reasons for judgment:
[U]ntil completion of the compression process and delivery into Texaco's pipeline at the inlet of Texaco's metering facility, Monsanto bore all risks, control and responsibilities for the material. Texaco did not acquire title and risk until the wet CO2 was converted into dry CO2. It was not until that point that both title and risks *259 passed to Texaco. The court finds it was at this point that the sale was complete. Therefore, the sale was for dry carbon dioxide, and the sales price included all of the components of the process.
On appeal Monsanto contends the trial court erred in the following respects: (1) in treating the business transaction at issue as a single contract rather than as a multifaceted agreement containing multiple contracts; (2) in failing to find costs incurred by Texaco in processing the wet CO2 into dry CO2 are not part of the sales price for wet CO2; (3) in failing to find that the price for the CO2 was a fixed price on a unit basis, whether the sale was of wet CO2 or dry CO2, and the fixed price did not include labor, electricity, and commodity charges; (4) in failing to characterize the transaction consistent with the trial judge in the state case; and (5) in finding that the sale transaction occurred when the dry CO2 left Texaco's facility. Alternatively, Monsanto argues that no sales tax may be imposed on the charges for electricity.
The St. Charles Parish sales tax ordinance imposes a sales tax of one-percent of the sales price upon the retail sale of tangible personal property. See Appendix, Excerpts from St. Charles Parish Sales Tax Ordinance, Section 2.01. Under the ordinance, a "sale at retail" is a sale of tangible personal property or a sale of services (Section 1.16); a "sale" means any transfer of title or possession, or both, of tangible personal property for a consideration (Section 1.18); "sales price" means the total amount for which tangible personal property is sold, including any services that are part of the sale valued in money, including the cost of material used, labor or service costs (Section 1.19); "tangible personal property" includes any personal property that "may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses" (Section 1.21). The ordinance specifically exempts from the sales tax the sale at retail, use or consumption of electric power or energy. Section 3.01(4).
The substance of a contract, not its wording nor the splitting or dividing it up by the contracting parties, is controlling for determination of sales-and-use tax liability. McNamara v. Electrode Corp., 418 So.2d 652, 662 (La.App. 1st Cir.), writ denied 420 So.2d 986 (La.1982). The taxpayer cannot defeat collection of sales taxes by either the wording, form, or label of a contract. Id. We must examine the "By-Product Sales Agreement" between Monsanto and Texaco to determine when sales took place within the meaning of the sales tax ordinance.
Paragraph 1.6 of the By-Product Sales Agreement defines "Delivery Point" as "the inlet of Buyer's metering facilities...." (Exh. P-2, p. 2.) Paragraph 7.1 provides, "Deliveries of Material hereunder shall be made F.O.B. the Delivery Point. Title and risk of loss to the Material shall pass to Buyer at the Delivery Point." (Exh. P-2, p-20.) Paragraph 11.3 states,
Seller shall not be liable for, and Buyer assumes liability for, all personal injury and property damage connected with the handling, possession, transportation, processing, further manufacture, other use, resale or other disposition of the Material after title passes to the Buyer, whether the Material is used alone or in combination with any other material.
(Exh. P-2, p. 25.)
As the trial judge found, the evidence establishes that the CO2 was measured (metered) near the outlet from the compression/dehydration facility into Texaco's pipeline, after it had been processed into "dry" CO2. Under the definitions in the contract between the parties, title and risk of loss passed to Texaco at the point of delivery, which was the inlet of the metering facilities. Because Texaco did not obtain title to the CO2 until after it had been compressed and dehydrated, under the definition of "sale" in the ordinance the sale did not take place until the point at which Texaco took title. The sales tax is imposed on sales as defined in the ordinance; therefore, the tax was properly imposed on the CO2 after it had been processed.
The additional question to be answered, however, is whether the commodity charges and the charges for operating and electrical expenses are part of the sales price, *260 as defined in the ordinance, so as to be subject to the tax.
The definition of "sales price" encompasses any services that are part of the sale valued in money, including the cost of labor or service costs. See Ordinance, Section 1.19. Accordingly, the operating expenses and commodity charges must be considered taxable. Further, although Section 3.01(4) of the ordinance exempts from sales tax the retail sale, use or consumption of electricity, the charges for electrical expense are taxable here because the electricity was part of the process used to manufacture the dry CO2.
It is undisputed that the ordinance was copied substantially from the state's sales tax statutes, La.R.S. 47:301 et seq., and that ordinances of a sales tax district and school board which were copied from the state's sales and use tax statute may be deemed to have incorporated interpretations of the state statutes on which they were based. See Sales Tax Dist. No. 1 Lafourche Parish v. Express Boat Co., Inc., 500 So.2d 364 (La.1987). However, there is no prior binding jurisprudence interpreting the portions of the statutes corresponding to the ordinance here.
Monsanto relies on unpublished rulings of a Baton Rouge district judge and the First Circuit which applied the state sale tax statutes to this same contract between Monsanto and Texaco. In Monsanto Company v. Shirley McNamara, No. 318,112 (19th Jud. Distr.Ct., Apr. 9, 1991), the district court concluded that the agreement for the processing of the CO2 was not a taxable item under the state statute. That ruling was affirmed in an unpublished opinion by the court of appeal, on the basis that "the evidence supports the facts found and the reasons assigned by the trial judge." Monsanto Company v. Shirley McNamara, Secretary, Louisiana Department of Revenue and Taxation, No. CA 91 0970 (La.App. 1st Cir. June 29, 1992).
Those decisions are not precedent for this Court, however, nor do we find them persuasive. A court of appeal is not bound to follow decisions of another circuit. Daigle v. Clemco Industries, 593 So.2d 1282, 1286 n. 4 (La.App. 1st Cir.1991); Nungesser v. Nungesser, 558 So.2d 695, 700 (La.App. 1st Cir.), writ denied, 560 So.2d 30 (La.1990). Under the "law of the circuit" rule a decision by one circuit is not binding upon another circuit, but rather is persuasive only. Wilson v. A-1 Industries, Inc., 451 So.2d 1251, 1253 (La. App. 4th Cir.), writ denied, 457 So.2d 14 (La.1984). See also, Woodard v. George Cole Chevrolet, Inc., 444 So.2d 1367, 1370 (La.App. 2nd Cir.1984).
Further, under Uniform RulesCourts of Appeal, Rule 2-16.3, unpublished opinions "shall not be cited, quoted, or referred to by any counsel, or in any argument, brief or other materials presented to the court, except in continuing or related litigation." See State v. Bridges, 617 So.2d 515 (La.App. 4 Cir.1993). This case is not a continuance of the Monsanto v. McNamara case; nor is it a related case, because it involves different defendants and the parish sales tax ordinance rather than the state sales tax statutes.
We find no merit to Monsanto's argument that the trial judge should have treated the "business transaction" between the parties as multiple contracts rather than a single contract. As mentioned above, this Court must apply the ordinance to the substance of the contract. We have done so. Under the various definitions set out not only in the ordinance but also in the contract itself, there was no sale until the product entered the meter as dry CO2. The commodity charges and operating/manufacturing expenses are part of the sales price regardless of Monsanto's attempts to segregate them.
Further, we find irrelevant Monsanto's arguments regarding what would happen if it had been Texaco workers rather than Monsanto workers who ran the processing facility. In fact, it was Monsanto employees who operated and maintained the facility and provided administrative services for it, Monsanto charged for their services, and those services must be considered part of the sales price and subject to sales tax.
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this *261 appeal are assessed against Monsanto Company.
AFFIRMED.
BOWES, J., dissents with reasons.

APPENDIX

EXCERPTS FROM ST. CHARLES PARISH SALES TAX ORDINANCE
The relevant portions of the sales tax ordinance state:
SECTION 1. As used in this ordinance the following terms, words, and phrases shall have the meaning ascribed to them in Sections 1.01 to 1.23, inclusive, of this ordinance, except when the context clearly indicates a different meaning.
* * * * * *
SECTION 1.16. "Retail Sale" or "Sale at Retail" shall mean a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property and a sale of services, as hereinafter set forth, and shall mean and include all such transactions as the Collector, upon investigation finds to be in lieu of sales; * * *. (The term "Sale at Retail" does not include sales of materials for further processing into articles of tangible personal property for sale at retail....)
* * * * * *
SECTION 1.18. "Sale" shall mean any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means, whatsoever, of tangible personal property, for a consideration, and includes the fabrication of tangible personal property for consumers who furnish, either directly or indirectly, the materials used in fabrication work, and the furnishing, preparing, or serving, for a consideration, of any tangible personal property, consumed on the premises of the person furnishing, preparing or serving such tangible personal property. A transaction whereby the possession of property is transferred but the seller retains title as security for the payment of the price shall be deemed a sale.
The term "Sale" shall also include the "Sales of Services" which means and includes the following:
* * * * * *
(7) the furnishing of repairs to tangible personal property, including by way of illustration and not of limitation, the repair and servicing of ... electrical and mechanical applicances [sic] and equipment, ... and office appliances and equipment.
SECTION 1.19. "Sales Price" shall mean the total amount for which tangible personal property is sold, including any services ... that are part of the sale valued in money, whether paid in money or otherwise, and includes the cost of material used, labor or service costs, except costs for financing ...; provided that, cash discounts allowed and taken on sales shall not be included, nor shall the sales price include the amount charged for labor or services rendered in installing, applying, remodeling or repairing property sold.
* * * * * *
SECTION 1.21. "Tangible Personal Property" shall mean and include personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses. The term "tangible personal property" shall not include the sale at retail of that property in the regular course of business.
* * * * * *
SECTION 2.01. There is hereby levied... a tax upon the sale at retail, the use, the lease or rental, the consumption and the storage for use or consumption of tangible personal property and upon the sale of services within the Authority as defined herein; and the levy of such tax shall be as follows:
(1) At the rate of one per cent (1%) of the sales price of each item or article of tangible personal property when sold at retail in the Parish, the tax to be computed on gross sales ... and to include each and every retail sale.
* * * * * *

*262 SECTION 3.01. The taxes imposed by this ordinance shall not apply to transactions involving the following tangible personal property.
* * * * * *
(4) The sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in the Parish of the following tangible personal property is hereby specifically exempted from the tax imposed by this ordinance: * * * electric power or energy * * *.
BOWES, Judge, dissenting.
I respectfully dissent from the majority opinion espoused by my esteemed brothers, being of the opinion that the contract at issue is for the sale of wet CO2 and for its conversion by Texaco, at a plant on Monsanto's property, which was built by Texaco, using labor and materials contracted for and paid for at a cost of some $7.5 million by Texaco, into dry CO2 for Texaco's use. Therefore, at the outset, these facts are very persuasive to me for the position that I take here. It seems most illogical to me to make a finding that Texaco, with its immense financial strength and its sophisticated knowledge and expertise, would contract to purchase the dry CO2 at a higher cost after having constructed a multi-million dollar facility at its own expense on another's property for conversion of the wet CO2 into dry CO2.
The majority opinion relies on the provision of the contract which provides that risk and title passes from Monsanto to Texaco at the point of delivery which is after the substance has been processed into dry CO2. However, my conclusion, after a reading of the contract as a whole and applying thereto the basic precepts of Louisiana law governing contracts, is that in this case, each sale is perfected and title is transferred prior to the conversion process. Louisiana law is unmistakably clear that a sale occurs when there is an agreement as to the thing to be sold, the price therefore and the consent of the parties, according to LSA-C.C. art. 2439 which reads as follows:
The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent. (emphasis added)
Furthermore, LSA-C.C. 2456 provides that:
The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid. (emphasis added)
Thus, it is clear to me that, by operation of law, the sale is complete and Texaco obtains a right in and to the wet CO2 prior to the conversion process, although it is incapable of measurement at that time. In my interpretation of the contract, the only purpose of the provisions thereof relied upon by the majority is for the purpose of allowing the substance to be measured and delivered to the Texaco plant. Furthermore, in my view, the fact that Monsanto retains "some" risk of loss at this point, does not change the nature of the contract at issue.
This Court has already held that the substance of a contract, and not the form, is controlling for the determination of sales and/or use taxes. See Louisiana Paving v. St. Charles, 604 So.2d 593 (La.App. 5 Cir. 1992). A review of the document at issue entitled "By-Product Sales Agreement" reflects that it contains several contractual agreements among the parties, only one of them being for the sale of wet CO2.
In addition, and very importantly, I note that our brethren in the First Circuit are in agreement with my interpretation of the issue before us now, although I am well aware that this Court is not bound by the decision of another circuit, especially an unpublished one. However, even though I do not rely on the opinion of the judges of the First Circuit, I do find persuasive their thinking in a case involving the identical issue with the identical contract and the state sales tax statute with *263 virtually identical language as the tax ordinance before us here.
Therefore, I conclude that the trial court erred in finding that the contract herein was for the sale of dry CO2 and that sales tax is due on the total amount expended by Texaco for the purchase of wet CO2, and not for the costs of converting that substance into dry CO2; or stated in another way, I conclude that Texaco should only pay sales tax on the value of the wet CO2 before it is converted into dry CO2.
Accordingly, I respectfully dissent from the opinion.
NOTES
[1] The following is typical of format of the monthly invoices:

"For CO2 purchased and received during the month of October, 1983:

Commodity Charge $ 25,000
Operating Expense for month 109,629
Electricity Expense (36,100 ckwh) $169,915
657,648 kcf @ 25¢/kcf 164,412
Sales Tax on CO2 Delivered 9,865
Spare Parts 0
 _______
 TOTAL 478,821"