650 So.2d 753 (1995)
MONSANTO COMPANY
v.
ST. CHARLES PARISH SCHOOL BOARD et al.
No. 94-C-2145.
Supreme Court of Louisiana.
February 20, 1995.
*754 Gary A. Bezet, Linda S. Akchin, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, for applicant.
Roy M. Lilly, Jr., Sanford & Lilly, Michael S. Baer, III, for respondent.
Francis J. Lobrano, for Kean's Partnership d/b/a Red Stick Linen Services, amicus curiae.
MARCUS, Justice.[*]
Monsanto Company ("Monsanto") filed suit against the St. Charles Parish School Board and E.H. Flynn, Director of Tax Collections, St. Charles Parish School Board ("Director"), seeking a refund of St. Charles Parish sales and use taxes, including interest and penalties which it paid under protest.[1] The assessment was made on portions of monthly payments which Monsanto received from Texaco, Inc. for the sale of carbon dioxide (CO2), a by-product of Monsanto's ammonia production plant, between June of 1983 and May of 1986 pursuant to a business agreement between the two companies. At issue was whether the taxes were owed only on the charges by Monsanto to Texaco for CO2 in its raw, unprocessed state (wet CO2), or whether the taxes were owed on all charges invoiced to Texaco by Monsanto which Monsanto incurred in the process of converting wet CO2 to dry CO2. Monsanto collected the taxes only on the charges for the wet, unprocessed CO2 and remitted the taxes to the Director. Following an audit, the Director took the position that all charges by Monsanto to Texaco which Monsanto incurred in the process of converting wet CO2 to dry CO2 should be included in the tax base and assessed Monsanto additional taxes for the period of June 1983 to May 1986 of $211,658 plus $52,915 in penalties and $64,731 in interest for a total of $329,304.
The trial judge rendered judgment in favor of St. Charles Parish School Board and against Monsanto Company, denying the requested refund of taxes, penalties and interest paid under protest. The trial judge held that the sale between Monsanto and Texaco was for dry CO2 and the sales price included all of the components of the process of converting wet CO2 to dry CO2. Monsanto appealed. The court of appeal affirmed.[2] Because this decision was contrary to a decision in a different circuit court of appeal on the tax assessment based on the same agreement between the same parties (Monsanto and Texaco), we granted certiorari to resolve the matter.[3]
Monsanto manufactured ammonia at its plant near Luling, Louisiana, in St. Charles Parish. During the process, raw or wet CO2 is generated as a by-product and vented into the atmosphere. Texaco needed large quantities of dry CO2 for a tertiary oil recovery project at its Paradis oil and gas field nearby.[4] *755 On September 24, 1980, Monsanto and Texaco entered into a "By-Product Sales Agreement" whereby Texaco agreed to purchase quantities of the CO2 by-product from Monsanto.[5] According to the agreement, Texaco would design and construct a facility on Monsanto property to convert the wet CO2 into dry CO2. Monsanto granted Texaco a servitude on its property to construct the facility and rights-of-way for construction of a power line for electricity and a pipeline to carry the CO2 from the facility to the oil and gas field. The facility was built by Texaco at a cost of seven and a half million dollars. The wet CO2 flowed from the ammonia plant into the facility where it was compressed and cooled (the drying or conversion process) and then flowed out of the facility into Texaco's pipelines which connected to Texaco's oil and gas field. The CO2 was measured after it was converted. Under the agreement, the point of delivery of the CO2 from Monsanto to Texaco was at the meter where the CO2 was measured. The meter was installed at the outlet of the facility (after the CO2 had been converted from wet to dry) because it was not possible to accurately measure or "meter" wet CO2.
Under the terms of the agreement, Texaco retained ownership of the facility and the right to remove the facility, power line and pipeline at its expense upon termination of the agreement. The agreement provided that Monsanto "had the full authority and responsibility to operate and maintain all of Buyer's [Texaco's] facilities which are located upstream from the delivery point with exclusive control over the management thereof." The agreement further stated that Monsanto would provide all supplies, repair parts, and labor required to operate and maintain Texaco's facility. Monsanto would provide the electricity needed to run the facility and bill those charges on a monthly basis to Texaco. Under a section of the agreement termed "price," Texaco agreed to pay Monsanto on a monthly basis for the following items: (1) a "commodity charge" of $25,000 (to cover administrative expenses), (2) the costs incurred in the operation of the facility (labor and maintenance), (3) the cost of electricity and (4) a charge of 25 cents per each mcf of CO2 contained in the material used by Texaco. Texaco was obligated to pay these charges even if it failed to purchase the material. Monsanto had the right to sell CO2 to third parties, or to use any CO2 not purchased by Texaco upon payment for use of the facility. The agreement provided that "[d]eliveries of Material hereunder shall be made F.O.B. the Delivery Point. Title and risk of loss to the Material shall pass to Buyer [Texaco] at the Delivery Point."
Monsanto would invoice Texaco on a monthly basis. For example:

For CO2 purchased and received during the
month of October, 1983:
Commodity charge $ 25,000
Operating Expense for month $109,629
Electricity Expense (36,100 ckwh) $169,915
657,648 kcf @.25/kcf[6] $164,412
Sales Tax on CO2 Delivered $ 9,865
Spare Parts 0
 ________
TOTAL $478,821

Monsanto charged Texaco sales tax only on "CO2 Delivered" and not on the commodity charge, the operating charge or the electricity. Texaco paid the taxes charged which were then remitted by Monsanto to the Director.
After May of 1986, the agreement between Monsanto and Texaco was terminated and the facility was dismantled by Texaco at its expense. By letter dated March 30, 1987, the Director made an assessment of sales and use taxes (including interest and penalties) against Monsanto for the payments by *756 Texaco to Monsanto for operating expenses, for the commodity charges and for the electricity expenses. Monsanto paid the amounts under protest and then filed this suit for a refund.
Art. VI, § 29(A) of the 1974 Louisiana Constitution grants authority to local governmental subdivisions and school boards to enact sales and use taxes "as defined by law." La.R.S. 33:2721 A provides some state parishes, including St. Charles Parish, with the authority to levy and collect a tax not exceeding one percent upon the sale at retail of tangible personal property and upon the sale of services, as defined in La.R.S. 47:301 through 47:317, the state sales and use tax statutes. Hence, the St. Charles Parish Tax Ordinance was enacted pursuant to constitutional and state statutory authority.
Section 2.01 of the St. Charles Parish Sales Tax Ordinance provides in pertinent part:
There is hereby levied ... a tax upon the sale at retail, ... of tangible personal property and upon the sale of services within the Authority as defined herein; and the levy of such tax shall be as follows:
(1) At the rate of one per cent (1%) of the sales price of each item or article of tangible personal property when sold at retail in the Parish, the tax to be computed on gross sales ... and to include each and every retail sale.
Section 1.16 provides in pertinent part:
"Retail Sale" or "Sale at Retail" shall mean a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property and a sale of services, ....
Section 1.19 provides in pertinent part:
"Sales Price" shall mean the total amount for which tangible personal property is sold, including any services ... that are part of the sale valued in money, whether paid in money or otherwise, and includes the cost of material used, labor or service costs, ....
The narrow issue for us to determine is whether the charges incurred in the process of converting CO2 are taxable items as part of the sale between Monsanto and Texaco.
The substance of the contract, not the form, is controlling for the determination of tax liability for sales/use tax purposes. Louisiana Paving Co., Inc. v. St. Charles Parish Public Schools, 604 So.2d 593, 595 (La.App. 5th Cir.), writ denied, 605 So.2d 1370 (La. 1992). The taxpayer cannot defeat collection of sales taxes by either the wording, form or label of a contract. Saenger Realty Corp. v. Grosjean, 194 La. 470, 193 So. 710, 711 (1940); McNamara v. Electrode Corp., 418 So.2d 652, 662 (La.App. 1st Cir.), writ denied, 420 So.2d 986 (La.1982). In Saenger, another tax assessment case, this court stated:
We are not concerned with the wording of the contract or how it is labeled, because this is not a suit between the contracting parties. If the State has a right to tax a subject matter of the contract, it could not be defeated by the label the contract was given or the words used by the contracting parties.
193 So. at 711.
Monsanto argues that the "By-Product Sales Agreement" is really several contractual agreements within one document with only one of the contracts being a sale of a taxable item, that is, the sale of wet, unprocessed CO2. According to Monsanto, Texaco agreed to purchase the "by-product" generated from Monsanto's ammonia plant which was wet CO2 . The sale between the parties was perfected when Monsanto and Texaco agreed to sell and purchase the wet CO2 for an agreed-upon price. In a separate contract, Monsanto agreed to allow Texaco to construct a plant on its property for processing wet CO2 into dry CO2 which facility would be owned by Texaco and constructed at Texaco's expense. Monsanto granted Texaco a servitude to build its facility on Monsanto's property together with rights-of-way for a power line and a pipeline. In another separate contract, Monsanto agreed to provide electricity, through its supplier, to Texaco's facility. Last, Texaco contracted with Monsanto to provide labor for the operation of the facility. Monsanto contends that its position is supported by the monthly invoices it sent to Texaco whereby the monthly charges were separated according to the separate contractual arrangements. Hence, under *757 Monsanto's reasoning, the only taxable item set forth on the invoice was for the "CO2 delivered." We disagree.
After reviewing the "By-Product Sales Agreement" and applying the principle that substance and not form of the contract prevails, we find that there is one and only one contract wherein Texaco agreed to purchase dry CO2, the finished product, which included the raw material, wet CO2, and all of the services necessary to process wet CO2 into dry CO2. The agreement provided that Texaco would purchase certain quantities of CO2 at the price of twenty-five cents per mcf as measured at the delivery point of the Texaco facility after conversion of the product had taken place. The "price" under the agreement included the cost of all of the services incidental to processing wet CO2 into dry CO2. Under the agreement the risk of loss for the product remained with Monsanto up to the delivery point. Up to that point Monsanto had full authority and responsibility to operate and maintain the facility and thereby maintain control and supervision over the product. Monsanto furnished the labor and the electricity necessary to process the CO2 from a by-product into a usable product. Although the monthly invoice separated the charges into categories, (commodity charge, operating charge, charge for labor and charge for electricity), the "price" under the agreement included all of these charges. All provisions of the by-product sales agreement related to one purpose, the conversion of wet CO2 into dry CO2 for a price. Clearly, there was one agreement between the parties to sell dry CO2. As the trial judge so aptly stated:
Thus, until completion of the compression process and delivery into Texaco's pipeline at the inlet of Texaco's metering facility, Monsanto bore all risks, control and responsibilities for the material. Texaco did not acquire title and risk until the wet CO2 was converted to dry CO2.... The court finds it was at this point that the sale was complete. Therefore, the sale was for dry carbon dioxide, and the sales price included all of the components of the process.
It follows, then, that if the sale was for processed or converted CO2, then the costs incurred in converting the product are components of the sale at retail as defined by the St. Charles Parish Sales Tax Ordinance. The definition of sales price under the ordinance encompasses any services that are part of the sale valued in money, including "the cost of material used, labor or service." In this case, the services that were part of the sale valued in money were operating (labor and maintenance) charges, commodity (administrative) charges and charges for electricity which were all charges that Monsanto bore and then passed on to Texaco. They must be considered part of the sales price and subject to sales tax. The Director was correct in assessing Monsanto for the additional sales taxes for the period of June 1983 to May of 1986. Accordingly, we find that the courts below were correct in denying Monsanto the requested refund of taxes paid under protest.[7]

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed. All costs are assessed against Monsanto Company.
NOTES
[*] Lemmon, J. (recused) not on panel. Rule IV, Part 2, § 3.
[1] In St. Charles Parish, the school board and its director of tax collections are responsible for the collection of all parish sales and use taxes, including but not limited to those imposed by the school board.
[2] 93-847 (La.App. 5 Cir. 5/11/94); 638 So.2d 257.
[3] 94-C-2145 (La. 11/17/94); 646 So.2d 363.

The 19th Judicial District Court rendered judgment in favor of Monsanto and against the Department of Revenue and Taxation, State of Louisiana, denying the state's assessment of sales and use taxes on the costs incurred in the conversion of CO2 pursuant to the same agreement between Monsanto and Texaco. Monsanto was granted a refund of the state sales and use taxes paid under protest in that case. The First Circuit Court of Appeal affirmed in an unpublished opinion finding that "the evidence supports the facts found and the reasons assigned by the trial judge." Monsanto Company v. Shirley McNamara, Secretary, La. Dept. of Revenue and Taxation, No. CA 91-0970 (La.App. 1st Cir. 6/29/92); 610 So.2d 1125 (Table).
[4] When CO2 is generated as a by-product of ammonia production it is saturated with water. Texaco needed to remove the water from the CO2, compress the CO2 and inject it into a pipeline that would carry the dry, compressed CO2 to the Paradis oil and gas field.
[5] The original agreement was amended in December of 1981. The terms referred to in this opinion are those of the amended agreement.
[6] "Kcf" on this invoice means the same thing as "mcf" in the oil industry. Monsanto began using "kcf" when it converted to the metric system.
[7] Monsanto further argues that the Director of Tax Collections for St. Charles Parish is bound by the result of the decision of the First Circuit Court of Appeal denying the assessment of sales tax by the Secretary of the Louisiana Department of Revenue and Taxation pursuant to the same agreement between Monsanto and Texaco. We reject this argument. This court is not bound by a prior decision of the First Circuit Court of Appeal in which the parties are not the same as the parties in this case.